The case for argument is 20-1035, John Bean Technologies v. Morris & Associates. Mr. Martz, whenever you're ready. Thank you, Your Honor. Good morning. May it please the Court. I'm Gary Martz. I'm here for Appellant John Bean Technologies, to whom I will probably refer during the argument at some point as JBT, as it's referred to in the briefing. Before the Court in this appeal are three different orders of the District Court. There's two summary judgment orders, and there's a claim construction order. And there are errors in each of those orders, and each of them should be reversed. I'd like to start my argument, though, by addressing the District Court's abuse of discretion when it denied JBT the opportunity to conduct discovery before it ruled on two separate motions for summary judgment in the case. And that requires a little bit of background into how the case proceeded procedurally. When JBT first filed this case in October of 2015, Morris responded with a motion to dismiss, filed in November of 2015. While that motion was pending, and there was another motion filed later to transfer venue, while those two motions were pending, discovery did not go forward in the case. And here I'd like to point out that the District Court made a small mistake in its order where it said that it had allowed discovery from the outset. Actually, the District Court told the parties to refrain from discovery while those motions were pending. And that's in the record and in order at... I hate to interrupt, sir. I mean, I know you picked this issue first. You've got, I think, 16 issues in this case, so I just want to move it along a little. And what is the context of this discovery dispute? Can you just give us the context of what you were seeking? Sure. Because you've got a lot of different issues here on claim construction and on summary judgment. Well, what we were seeking was... Okay, and this is on the first summary judgment motion, which addressed Morris' integral auger-chiller. And the allegation in that case, there were allegations of false advertising and false marking. And the discovery that we wanted to take was discovery from a customer of both companies. This is poultry processing equipment that we're talking about, and these are the only two companies in the field. And so most large poultry producers are customers of both parties. And so there was an issue that JBT had had with Purdue Farms, a large poultry producer, where Purdue didn't want to buy a product with a certain feature, water flow release, or what they're called in JBT's products, because they feared that Morris would sue them, as Morris had sued them in the past, because Morris was claiming that it had patented this technology. And we presented a fairly extensive set of emails back and forth between JBT and Purdue Farms showing that there had been harm to JBT's reputation from this exchange. Okay, so on this review of the district court under an abuse of discretion, one of the arguments was that you intentionally delayed seeking this discovery because you knew about the so-called incident for quite a few years. Am I talking about the same thing? Yes, that is the same incident, and I will address that. We didn't delay in seeking that discovery, Your Honor. When you look at this case sort of from a high level, you see that the case was filed in November of 2015, and then the summary judgment motion wasn't filed until early in 2018, and it looks like the case is pending for a long time. But the point is that discovery was stayed in this case from the filing of Morris' motion to dismiss in November of 2015. That motion was pending until March of 2017. It pended for almost a year and a half, and during that time discovery wasn't allowed. So discovery was finally allowed in this case beginning at the early March of 2017. At that point there was no discovery deadline in the case. There was an interim scheduling order that set a tentative discovery deadline of 81 days after the district court's claim construction ruling. That claim construction ruling had not been entered by the time this motion for summary judgment was ordered.  On an issue such as this, on an abuse of discretion, on a discovery order, there is enormous deference allowed to the district court. Everything you're telling us here goes to a long litany of things that happened in this case over periods of time. We weren't there. The district court was there. So how do you avoid the standard of review under an abuse of discretion for this kind of issue, which seems really relegated to the district court's discretion? He's there, she's there, they know what's happening, they know the ins and outs of the case, and we're just looking at it from 40,000 feet. Well, I think, Your Honor, where the abuse of discretion comes in is that the district court made a mistake because it believed that it had allowed discovery from the outset of the case. That was not true. Discovery was only conducted during the time of March 2017 to October or November of 2017. And during that time, discovery was taken. And you can get the impression from the court's order that JBT didn't conduct discovery in the case or that it was sitting on it or not conducting discovery, but it was conducting discovery during that time. It had conducted written discovery from Morris and it took seven separate depositions of Morris employees and executives during that time. It was not just doing nothing, but it had not gotten to the point yet where it had conducted this particular discovery because it did not know at that point, we did not know at that point, that the discovery needed to be taken in any particular order. And I think that's where the abuse of discretion comes in because it's an abuse of discretion. We cited the Iverson case in our brief, and I think the standard on this is it's an abuse of discretion when the district court grants summary judgment when a party hasn't had the opportunity to conduct discovery on an issue. And this isn't a situation either where the parties conducted discovery over a long period of time or there was a discovery deadline or there was any sort of summary judgment deadline. The district court actually ordered this summary judgment briefing sua sponte and ordered Morris to file this motion. And I think under the circumstances, yes, the district court does have discretion in this area, but the discretion is not unlimited. It's not unbounded. And the discretion ends when the district court grants summary judgment against a party based upon not having sufficient evidence when it hasn't allowed the opportunity to get that evidence. This is Judge Taranto. Can I just ask, since you're talking about a single incident involving a single company, why was there not time after the judge invited or directed Morris to file a competitive injury summary judgment motion as to the auger chiller for you to take that discovery from the Purdue people that your affiant recounted? We're not talking about a large amount of discovery. It was in a very compressed time frame, and there just wasn't opportunity to conduct the discovery at that point. And so that was the main reason why, that there wasn't an opportunity to take it. And I think also as well as it was not, I don't think it was quite as simple as taking a single deposition. There were multiple employees for Purdue Farms involved, and it would have taken some time to set that up. But to return to this issue of not having any kind of notice that this was going to come up, not having any sort of deadlines, and like I said too, the district court's belief that discovery had been ongoing since the beginning of the case when at the point when this happened, it had been going on for perhaps half a year, with the parties, again, conducting discovery diligently, not just leaving this out there, not just refusing to do anything, not moving the case forward, but actually taking steps during this time. And I think it also is worth noting too that not long before the district court ordered summary judgment on this issue, or summary judgment briefing on this issue, the parties had filed a joint motion where they had agreed that they actually needed the court's claim construction order so they could understand what the scope of discovery would be. Excuse me, this is Judge Lynn. Since you brought up claim construction and you have only limited time left, you've raised a whole host of claim construction issues. Give us your argument on the best of the claim construction points you've raised. Well, I think the best one, the best claim construction argument that we raised refers to the effect of Morris' language in the preamble of these claims that this is a post-chill decontamination tank, this technology that's covered in the two patents, the 173 patent and the 489. And there are multiple aspects to that, but the fact is that Morris showed, first of all, they relied on the preamble during prosecution to distinguish the prior art. There was a patent called Ennis that came up during prosecution, and Morris distinguished Ennis because, quote, it disclosed a chiller tank, not a post-chill decontamination tank. That's a quote. And did not disclose, quote, a post-chill decontamination tank assembly that receives poultry carcasses from a chiller. And those amendments succeeded, and we think that that transforms the preamble into a limitation. But there are other issues as well in terms of this post-chill decontamination tank assembly language. Morris filed petitions to make special in the case, and those petitions to make special, they both times identified the decontamination tank being post-chill as a limitation. They said, quote, all of applicants' independent claims describe a post-chill decontamination tank assembly positioned adjacent to bird delivery end of a poultry chiller. Thank you. I think you've addressed that issue, and I think I also heard that the bell has rung. I think it did. Thank you, Your Honor. Thank you. Let's hear from the other side. Mr. Crane? Good morning, and may it please the court. My name is Andrew Crane, and I represent the defendant, Cross Appellant Morris and Associates. The lower court's rulings on summary judgment and claim construction are correct and should be affirmed. And if it's acceptable to the court, I will address the abuse of discretion issue that Mr. Marks raised, and then I will seek to address the claim construction issue that he addressed before his time expired, unless the court would like to ask any other questions. This is Judge Toronto. You can talk about what you want in the order you want, but I'm curious about why there's Article III standing for the cope portion of the case. What's the injury to JBT fairly traceable to the supposed marking? But you can get to that later, and I wish we didn't have to work, that I didn't feel compelled to ask about it, but that's actually a jurisdictional question. Okay. Thank you for the question, Judge Toronto. If you like, I will go ahead and seek to address that first. The claim, as we understand it, is born in both... This is Judge Pross. Could you just tone your voice down a little? I can. It's not your fault. It's just the way things work on this phone thing. I will move away from the microphone. Thank you. The issues with the cope product pertain to the false marking and the false advertising. As we understand the lower court's ruling with regard to false marking, the claim destruction and the summary judgment ruling on that would... There was indeed no admissible evidence of the false marking and on the false advertising of the same as well. Let me give that some additional consideration, Judge Toronto, and I will try to circle back to that if I may. With regard to the issue of the abuse of discretion, with regard to the court's schedule, Mr. Marks mentioned that there was a motion to dismiss filed at the very outset of the case in November of 2015. The issue there was that there is no competitive injury and the court denied that motion because it was based on the pleadings, so this issue was flagged for JBT at the very outset of the case. Was that motion both as to the Auger Chiller and as to the decontamination tanks or just the Auger Chiller? That motion, I would have to go back and double-check that on the claim of... I believe it was to both, if I recall correctly, but I don't recall off the top of my head, Judge, because with regard to the false marking, there was no competitive injury component there. And so, thus, it was right to be dismissed. When we move into 2017, the initial disclosures came in February. As Mr. Marks said, discovery opened shortly after that. In the first of May, we received interrogatory number six, as mentioned in the red brief, and there was no mention of additional scrutiny. There was a mention of Purdue. So, clearly, in early 2017, there was a notion of an issue with Purdue on the mind of JBT, and this stretched back to an event that allegedly occurred in 2013. I will fast-forward through the rest of the year in 2017. That September, after there was some exchange and correspondence between the parties, JBT indicated in response to Morris' inquiry of what is the evidence of competitive injury, and JBT responded, as we said in the brief, there was no supplementation at this time. Mr. Marks was correct that the court did order Morris to file a summary judgment brief after granting a protective order motion, and even then, moving into early 2018, JBT made no effort to acquire this discovery. So, as Chief Judge Prost mentioned a moment ago, there is a high standard here with regard to abusive discretion. JBT certainly had plenty of time. It was going to take this discovery, and it would have had to have done so pursuant to subpoena, since the testimony would have come from out of state. It would have actually come from here in Georgia versus where the case is situated in Arkansas. So, I believe the court has... That information was available, and it could have been acquired from JBT, and since they did not do that, the court did not abuse its discretion. Turning to the issue... It could have been acquired from Purdue. Well, to the extent they existed... The crucial evidence would have been from Purdue's side why it engaged in the behavior that JBT's later affiants described with respect to buying one kind of auger chiller from JBT without the vents or whatever one wants to call them and then retrofitting it. Isn't that what the testimony would be? Namely, from Purdue? That's right. The testimony would have been from Purdue with respect to why they did or did not include those features in the product that they bought from JBT. Correct. Turning to the issue of client construction on the post-chill decontamination tank that Mr. March raised near the close of his time, the lower court ruled correctly that the preamble of both the 173 and 489 claims relate to an intended use and therefore are not limiting with respect to the term post-chill decontamination tank. Looking at the background of the patents, there is some discussion that the concept of a post-chill decontamination tank in and of itself is not new. In fact, the background of each patent goes into some discussion that the post-chill decontamination tanks of the time were inferior in that they had a large footprint. They had inconsistent dwell times. There was no vigorous churning of the solution that may be in the tank to adequately perform the decontamination activity. The claim body of the patent solved these issues in the elements of the claim that speak to the tank, the paddles, the power means, and the additional elements of the claim. The specification in the abstract, there is a statement that the placement may usually be after the poultry chiller, clearly suggesting that the patentee contemplated other locations. The same thing in the summary. It says it's preferably located after the chiller. Again, clearly indicating that the patentee contemplated other locations. This is just trying to connect you to this question. One form of accounting for what's in the preamble is to say that it's about an intended use, and I want to put that to one side. A different form of accounting for what's in the preamble is to accept the premise that much, if not all, of it is limiting, but it's all a form of limitation that uses the language for doing certain things, and for doing certain things under Hillgrave and other precedents that you describe is language that, as to a product, is satisfied when the product is reasonably capable of doing those things without, I'm just going to use the term, material alteration. Take as an assumption for purposes of this question that that is how I would understand a limiting preamble here. Then at summary judgment, the question would be, what did JBT say about, and with what evidence did it support something it said that all of the accused marked products were not reasonably capable of that use? What evidence did JBT put in at the summary judgment stage on the COAP products about that? To make sure I understand your question, Judge Toronto, that the claim tank is only capable of the use specified in the preamble of being located immediately adjacent or after the chiller, do I understand you correctly? Not only capable, but for it to be falsely marked under a reasonably capable interpretation, it would have to be not reasonably capable of being put just behind the auger chiller and not reasonably capable of being used for, let's call them whole birds as opposed to drumsticks. Okay. I think I have a better understanding, and forgive me if I vary astray here. There is no evidence that I'm aware of that would satisfy your inquiry, and that actually gets to a larger issue here that's referenced in the red brief, let's see, early on around pages five and six, that the litigation that we have here, and we actually have another appeal pending before this court scheduled to be argued in October, are two cases that follow a prior litigation in North Carolina where Morris obtained a permanent injunction against JBT's predecessor, Cooling and Applied Technology, with regard to its product at the time, Just Toronto, that was in fact placed immediately after the poultry chiller. So it is reasonably capable of being placed in the poultry line immediately after the poultry chiller or at another location, and that's where we've brought up with regard to the marketing and branding issues on parts cope and pre-cope, that those are essentially branding of the same structural device that may be placed in other areas within the poultry processing line, and they're reasonably... Let me just try to ask. I remember that you said, and I think it was attached to your summary judgment motion, you had some declaration saying, all these products are essentially structurally alike and they can be put anywhere. What did JBT say in response to that? Actually, I'm not aware that they disputed that. By say, I mean what evidence did they advance in support of any contradiction of that, if there was a contradiction of that? Again, and thank you for the question, I don't believe that JBT has in fact disputed that, that in fact the device that would be placed before the chiller or somewhere down the line is indeed reasonably capable of being placed at either one of those points and also immediately after the chiller. JBT, I don't believe, I'm not aware of anything, as I speak to you now, that has disputed any of that. I will leave you alone after this one last question. And then returning to where I started, do you dispute, this is back on this article three, injury in fact fairly traceable to the marking of the co-products question that I flagged, do you dispute that John Bean offered or was asked to provide a product competing with COPE and declined to do so as a result of the marking? That is evidence, I think, that was obtained in discovery that they did have opportunity to provide a product, however, they declined to do so. That is correct, and according to my understanding of the evidence. May I address one more point that I was getting to at the post-chill decontamination tank with regard to ENDS? Just real quickly, the distinguishing arguments with regard to the ENDS patent were, if you look back at that, were strictly focused on the elements of the claims, specifically reverencing the paddles in the claims, the smaller footprint, and the different claim chemical composition in the decontamination tank versus the chiller. That is why we believe that both for the distinguishing of ENDS and that petition that makes special, there is clearly, and excuse my language here, clearly no clear and unmistakable disavowal of prostate cancer risk. Thank you. Okay. You did not reach your conditional cross-appeal as I understand it. Will we have the rest of the briefs on that? Thank you. Mr. Marks? You have rebuttal to the main appeal? Yes. If I may respond to the issue that was raised with regard to the Cope products just a few minutes ago. The motion for summary judgment on the Cope products only covered the issue of equivalency. The issue of damages for that was not raised. If pressed on that issue, JBT would have presented proof of lost sales related to the Cope products and marking those falsely as patented. There is evidence of injury. It is not in the record because that issue was never raised in the case. Perhaps what you just said is enough, but Article III jurisdiction is something that a court is obliged to assure itself of before it touches the merits. The fact that it was not raised by Morris does not fully answer the question of whether the court had Article III jurisdiction to consider the claim of false marking or advertising of the Cope products. I think in that regard, with regard to Article III standing, there are allegations of harm with regard to these products in the complaints. It does not seem like, since that issue did not get raised at summary judgment and there was never any call to put evidence in the record on it, I think it probably goes to what was pleaded. What was pleaded was that the false advertising harmed a commercial interest to the extent that it damaged JBT's business reputation. I think for false marking, it is the same thing. There is a competitive injury for loss of reputation and goodwill and deterring customers from using JBT's competing products. There are allegations of that as well and there are allegations of lost sales. I think in terms of alleging a concrete injury of some sort for Article III standing, I believe that should suffice in terms of establishing that the court had subject matter jurisdiction over this case because there was standing, because JBT did allege that there was some injury that it was seeking to redress. Thank you. That is enough for me on that. That addresses everything from Mr. Crain's argument that I wanted to address. Unless there are further questions, I will end my argument. Fine. Thank you. We thank both sides and the case is submitted.